# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| Laura Evans and Carol Nowak-Galkowski, as representatives of a class of similarly situated persons, and on behalf of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan, <br><br> Plaintiffs, <br><br> v. <br><br> Associated Banc-Corp, the Associated Banc-Corp Plan Administrative Committee, and John and Jane Does 1-20, <br><br> Defendants. | Case No. 1:21-cv-60 <br><br><br> **COMPLAINT** <br><br> **CLASS ACTION** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Laura Evans and Carol Nowak-Galkowski, as representatives of the Class described herein, and on behalf of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Associated Banc-Corp ("Associated Bank"), the Associated Banc-Corp Plan Administrative Committee ("Committee"), and John and Jane Does 1-20 (collectively, "Defendants"). As described herein, Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by applying an imprudent and inappropriate preference for products associated with Associated Bank within the Plan, despite their poor performance and lack of traction among fiduciaries of similarly sized plans. In addition, Defendants failed to monitor or control the Plan's recordkeeping expenses paid to Associated Bank's subsidiary, costing the Plan millions of dollars in excessive administrative fees over the

course of the statutory period. Plaintiffs bring this action to remedy this unlawful conduct, recover

losses to the Plan, and obtain other appropriate relief as provided by ERISA.

**PRELIMINARY STATEMENT**

2.      As of September 2020, Americans had approximately $9.3 trillion in assets invested

in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY

INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020),

*available at* https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans

have largely replaced defined benefit plans—or pension plans—that were predominant in previous

generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available*

*at*  http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx.

By 2012, approximately 98% of employers offered defined contribution plans to their current

employees, whereas only 3% offered pension plans. *Id.*

3.      The potential for disloyalty and imprudence is much greater in defined contribution

plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed

monthly pension payment, while the employer is responsible for making sure the plan is

sufficiently capitalized, and thus the employer bears all risks related to excessive fees and

investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive

to keep costs low and to remove imprudent investments. But in a defined contribution plan,

participants' benefits "are limited to the value of their own investment accounts, which is

determined by the market performance of employee and employer contributions, less expenses."

*Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep

2

costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

4.    For financial services companies like Associated Bank, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, using proprietary investment products that a non-conflicted and objective fiduciary would not choose.

5.    To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011) (citation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.    Defendants have not acted in the best interest of the Plan and its participants. Instead, Defendants used the Plan to promote Associated Bank's proprietary financial products and earn profits for Associated Bank. Defendants' retention of Associated Bank's proprietary funds in the Plan reflects a failure to objectively evaluate the Plan's investment options in an unbiased manner. Throughout the statutory period, Defendants have offered Associated Bank investment products within the Plan that were overwhelmingly rejected by similarly situated fiduciaries. A prudent and loyal fiduciary would not have selected or retained Associated Bank's unpopular and poorly performing funds, and would instead have selected superior alternatives covering the same asset classes that are widely used by similarly situated fiduciaries. Defendants' imprudent and disloyal retention of Associated Bank financial products in the Plan has resulted in

3

of millions of dollars in lost investment returns to the Plan and its participants since the start of the statutory period in 2015.

7. At the same time, Defendants selected a subsidiary of Associated Bank as the Plan's recordkeeper and then failed to prudently and loyally monitor the Plan's recordkeeping expenses, instead allowing the Plan to pay nearly three times what a prudent and loyal fiduciary would have paid for such services. These excessive recordkeeping payments resulted in millions of dollars in additional losses to the Plan and its participants during the statutory period, while further enriching Associated Bank.

8. Based on this conduct, Plaintiffs assert a claim against Defendants for breaches of the fiduciary duties of loyalty and prudence, and against Associated Bank for failing to adequately monitor the Committee and remedy the fiduciary breaches described herein. In connection with this claim, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Associated Bank in connection with its fiduciary breaches or the Plan's assets, and other appropriate relief.

## JURISDICTION AND VENUE

9. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties

giving rise to this action occurred, and where Defendant may be found.

## THE PARTIES

### PLAINTIFFS

12.     Plaintiff Laura Evans resides in Metamora, Illinois, and has been a participant in the Plan since March 2014. As a Plan participant, Plaintiff Evans's account has been record kept by Associated Bank's subsidiary, and she has been financially injured by the unlawful conduct described herein. Plaintiff Evans's account would be worth more had Defendants not violated ERISA as described herein.

13.     Plaintiff Carol Nowak-Galkowski resides in Sobieski, Wisconsin, and was a participant in the Plan from before the statutory period until approximately January 2018. As a Plan participant, Plaintiff Nowak-Galkowski invested in multiple investment options managed by Associated Bank's subsidiaries and her Plan account has been record kept by Associated Bank's subsidiary.  As a result, she has been financially injured by the unlawful conduct described herein. Plaintiff Nowak-Galkowski's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

### THE PLAN

14.     The Plan was established by Associated Bank. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

15.     The Plan covers eligible employees of Associated Bank and its subsidiaries. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan.

5

16. The Plan is a very large plan in the defined contribution plan marketplace. Since 2014, the Plan has had between $453 million and $690 million in assets and between 5,600 and 7,000 participants, and has consistently ranked in the top half of the 99th percentile of all defined contribution plans by size.[1]

17. As of the end of 2014, the investment options under the Plan consisted of: 7 actively-managed funds organized as collective trusts and managed by Associated Bank's subsidiary, an Associated Bank money market fund, Associated Bank stock, 10 actively managed funds managed by third-parties, and 2 passively managed funds offered by Vanguard. The Plan has held investments associated with Associated Bank throughout the statutory period.

DEFENDANTS

***Associated Bank***

18. Defendant Associated Banc-Corp ("Associated Bank") is a U.S. regional bank holding company headquartered in Green Bay, Wisconsin. Among its subsidiaries are Associated Bank, N.A., a nationally chartered bank, and Associated Trust Company, N.A., which performs asset management and participant recordkeeping for the Plan. Defendant Associated Bank is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Associated Bank exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

---

[1] At the end of 2016, there were approximately 656,000 defined contribution plans. Only 2,621 had more than 5,000 participants, and only 1,462 had more than $500 million in assets. U.S. DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Dec. 2018), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2016.pdf.

19.     Associated Bank is specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the Department of Labor. Associated Bank's status as Plan Administrator also renders it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

20.     To the extent that Associated Bank has delegated any of its fiduciary functions to others, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

*The Plan Administrative Committee*

21.     According to the Plan's Summary Plan Description dated January 1, 2020, "the Compensation and Benefits Committee of the Company's Board of Directors has appointed the Plan Administrative Committee to act as Administrator of this Plan." The duties of the Plan Administrative Committee ("Committee") include selecting the investments offered by the Plan. Pursuant to these authorized duties and functions, the Committee and its members exercise discretionary control respecting management of the Plan, exercise authority or control respecting management or disposition of Plan assets, and/or have discretionary authority or responsibility in the administration of the Plan. The Committee and its members are therefore functional fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

7

22.     Defendants John and Jane Does 1-20 (the "Doe Defendants") are members of the Committee, or were members of the Committee during the statutory period. The identities of the Doe Defendants are not currently known to Plaintiffs.

## ERISA FIDUCIARY DUTIES

23.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

24.     These ERISA fiduciary duties are "the highest known to the law." *Kraft Foods Glob.*, 814 F. Supp. 2d at 852 (citation omitted).

### DUTY OF LOYALTY

25.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and

8

beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added). In addition, "failing to monitor and control recordkeeping fees . . . can constitute a breach of the fiduciary dut[y] of loyalty . . . required by ERISA." *Morin v. Essentia Health*, 2017 WL 4083133, at *5 (D. Minn. Sept. 14, 2017), *report and recommendation adopted*, 2017 WL 4876281 (D. Minn. Oct. 27, 2017) (citing *Tussey v. ABB, Inc.*, 746 F.3d 327, 336–37 (8th Cir. 2014)).

### DUTY OF PRUDENCE

26.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

27.     ERISA also requires fiduciaries to limit administrative expenses. 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … *and defraying reasonable expenses of administering the plan*[.]"). A fiduciary may breach this duty by authorizing higher-than-market recordkeeping fees or maintaining a recordkeeping deal for its own benefit. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim); *Tussey v. ABB,*

9

*Inc.*, 746 at 336 (affirming judgment against plan sponsor based on "overpaying" recordkeeper and benefiting from the overpayment).

## DEFENDANTS' VIOLATIONS OF ERISA

**I.**  **DEFENDANTS' PROCESS FOR SELECTING AND MONITORING INVESTMENT OPTIONS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST.**

28.      Defendants' process for selecting and monitoring the Plan's investment options was disloyal and imprudent. Defendants included in the Plan proprietary investments overwhelmingly rejected by fiduciaries of similarly sized plans, when a nonconflicted fiduciary would have selected among the more popular and better performing nonproprietary alternatives available. Although using proprietary options is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments. Based on Defendants' retention of unpopular and poorly performing proprietary funds in asset classes for which superior nonproprietary alternatives were available and far more widely utilized by non-conflicted fiduciaries, it is reasonable to infer that Defendants' process for selecting and monitoring investments for the Plan was tainted by self-interest. The following examples are illustrative of a fiduciary process for selecting and monitoring investments in the Plan tainted by imprudence and disloyalty, which improperly affected Defendants' decisions with respect to all of the Associated Bank funds in the Plan.

*Associated Balanced and Growth Balanced LifeStage Funds*

29.      The Plan's Associated Balanced LifeStage and Associated Growth Balanced LifeStage Funds offer good examples of Defendants' imprudent and self-interested process for managing the Plan's investments. Since at least the beginning of 2014, the Plan has included both

10

the Associated Balanced LifeStage and Growth Balanced LifeStage Funds. As of yearend 2016, the Plan had approximately $41 million invested in the Associated Balanced LifeStage Fund and $27.5 million invested in the Associated Growth Balanced LifeStage Fund. As of 2019, the Plan had $43 million invested in the Associated Balanced LifeStage Fund and $27 million in the Associated Growth Balanced LifeStage Fund.

30.    Based on a review of publicly filed Form 5500s for plans with over $500 million in assets, Plaintiffs are not aware of any defined contribution plan other than the Plan that offered the Associated Balanced LifeStage Fund or the Associated Growth Balanced LifeStage Fund.

31.    The fiduciaries of other large defined contributions preferred other funds over the Associated Balanced LifeStage and Associated Growth Balanced LifeStage Funds for good reason.

32.    The following chart shows the performance of the Associated Balanced LifeStage Fund as of the end of 2015 compared to its own custom benchmark identified by Associated Bank, and two other funds which had similar asset allocations and levels of risk[2] and greater acceptance among fiduciaries of similar plans:

---

[2] Morningstar has created a taxonomy of mutual funds that divides mutual funds into 64 different categories, with categorization determined by historical analysis of the underlying holdings of each fund. All three funds in the chart were placed by Morningstar in the US Fund Allocation—50% to 70% Equity category.

11

| Fund Name | Ticker | 3-Yr Return (as of 12/31/15) | 5-Year Return (as of 12/31/15) | # of Plans > $500M in Fund |
|---|---|---|---|---|
| Associated Balanced LifeStage | | 6.83% | 6.04% | 1 (the Plan) |
| Associated Balanced LifeStage Custom Benchmark | N/A | 7.41% | 7.07% | N/A |
| Vanguard Wellington Admiral | VWENX | 9.64% | 9.07% | 210 |
| American Funds American Balanced R6 | RLBGX | 10.81% | 10.18% | 75 |

33. A prudent and loyal review of the marketplace in 2015 would have revealed that the Vanguard and American Funds options were performing significantly better than the Associated Balanced LifeStage Fund, and caused a prudent and loyal fiduciary to remove the Associated Bank fund. Defendants' retention of the Associated Balanced LifeStage Fund in the Plan reflects a fiduciary process imprudently and disloyally tilted in Associated Bank's favor.

34. Similarly, the following chart shows the performance of the Associated Growth Balanced LifeStage Fund as of the end of 2015 compared to its custom benchmark and two other funds which had similar asset allocations and levels of risk[3] and greater acceptance among fiduciaries of similar plans:

---

[3] All three funds in the chart were placed by Morningstar in the US Fund Allocation—50% to 70% Equity category.

12

| Fund Name | Ticker | 3-Yr Return (as of 12/31/15) | 5-Year Return (as of 12/31/15) | # of Plans > $500M in Fund |
|---|---|---|---|---|
| Associated Growth Balanced LifeStage | | 8.3% | 7.02% | 1 (the Plan) |
| Associated Growth Balanced LifeStage Custom Benchmark | N/A | 9.26% | 8.33% | N/A |
| T. Rowe Price Capital Appreciation | PRWCX | 13.15% | 11.39% | 18 |
| Fidelity Puritan | FPURX | 10.69% | 9.21% | 84 |

35.     Again, a prudent and loyal review of the marketplace in 2015 would have revealed that the T. Rowe Price and Fidelity options were performing significantly better than the Associated Growth Balanced LifeStage Fund, and caused a prudent and loyal fiduciary to remove the Associated Bank fund. Defendants' retention of the Associated Growth Balanced LifeStage Fund in the Plan also reflects a fiduciary process imprudently and disloyally tilted in Associated Bank's favor.

36.     Instead of removing these poorly performing Associated Bank investments, in 2017 Defendants removed a *non*-proprietary fund in the same asset class (the Vanguard Balanced Index Fund), while imprudently and disloyally retaining the Associated Bank funds. This led to a predictably poor outcome for Plan participants. As of yearend 2015, the Associated Balanced LifeStage Fund had materially trailed the removed Vanguard fund by 2.46% and 2.67% over the prior 3- and 5-year periods respectively. The performance of the Associated Growth Balanced LifeStage Fund at this time was similarly poor compared to this Vanguard option, trailing it by 0.99% and 1.69% over the prior 3- and 5-year periods respectively. Unlike the Associated Bank funds, the Vanguard Balanced Index Fund was widely held by similarly situated fiduciaries, appearing in over 60 plans with over $500 million in assets.

13

37.     As Defendants should have realized based on these 2015 performance numbers, the Plan would have been far better served by retaining the Vanguard fund and removing the two Associated Bank funds. As of September 30, 2020, the Associated Balanced LifeStage Fund had materially trailed the Vanguard fund by 1.87% and 1.83% over the prior 3- and 5-year periods respectively.[4] Likewise, as of the same date, the Associated Growth Balanced LifeStage Fund had materially trailed the Vanguard fund by 0.8% and 0.29% over the prior 3- and 5-year periods respectively, despite the fact that the Associated fund was taking on *more* risk than the Vanguard fund. On a risk-adjusted basis, Vanguard Balanced outperformed the Associated Growth Balanced Fund by 1.35% and 1.13% per year over the prior 3- and 5-year periods.[5] However, instead of removing the Associated Bank options, Defendants removed the nonproprietary Vanguard option in 2017, further reflecting a disloyal and imprudent fiduciary process that tainted the Plan's entire menu of Associated Bank investment options.

***Associated Equity Income Fund***

38.     Another good example of Defendant's flawed investment management process is the Associated Equity Income Fund in the Plan, which was included in the Plan from at least the beginning of 2014 until some point in 2017.

---

[4] All performance data regarding the Plan's investments is from Morningstar Direct, a widely used database of investment returns.

[5] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. Not only did the Associated Balanced Lifestage and Growth Balanced Lifestage Funds show almost entirely negative alpha during the subject period, but this lack of skill—both on an absolute basis and compared to Vanguard Balanced—should have been apparent to the Plan's fiduciaries at the beginning of the subject period. As of December 31, 2015, the Balanced Fund had an alpha of -1.12% and -1.71% *per year* against its custom benchmark over the prior 3- and 5-year periods respectively, compared with positive alpha of 0.37% and 0.50% by Vanguard Balanced against the same benchmark. The Growth Balanced Fund had alpha of -1.26% and -1.92% against its custom benchmark over those same 3- and 5-year periods.

39.    Plaintiffs are not aware of any defined contribution with over $500 million in assets that offered the Associated Equity Income Fund during the relevant time period.

40.    The fiduciaries of other large defined contributions avoided the Associated Equity Income Fund for good reason. As of yearend 2015, the Associated Equity Income Fund had underperformed its benchmark by 1.06% and 1.52% over the prior 3- and 5- year periods, respectively. A prudent and loyal fiduciary would have removed this fund at the beginning of the statutory period based on this performance.

41.    The foregoing examples reflect a fiduciary process tainted by self-interest, resulting in imprudent and disloyal decisions that infected the selection and monitoring of all Associated Bank-affiliated investments in the Plan. Indeed, although asset management companies such as Associated Bank tend to favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016). Further, this poor performance tends to persist, empirically demonstrating that "the decision to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808–10. A study of third-party administrators such as Associated Bank similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

42.    Given the poor track record of Associated Bank's funds and their lack of utilization among fiduciaries of other large plans, it was imprudent to retain these funds in the Plan.

Defendants improperly retained these funds to serve Associated Bank's own business interests, not participants' interests, and generate additional investment fee income for Associated Bank.

## II. DEFENDANTS FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S RECORDKEEPING EXPENSES.

43.     In addition to the foregoing examples of failures with respect to the Plan's investment program, Defendants failed to properly monitor and control the Plan's recordkeeping expenses. Instead, Defendants allowed the Plan to pay millions of dollars of excessive recordkeeping fees to Associated Bank's subsidiary, Associated Trust Company, N.A. ("Associated Trust").

44.     Notably, the Plan was the only plan with more than $500 million in assets for which Associated Trust provided recordkeeping services. Excluding the Plan, the average size of plans for which Associated Trust provided recordkeeping services was a mere $27 million.

45.     Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

46.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. However, Defendant failed to leverage the Plan's size and allowed the Plan to pay recordkeeping fees to Associated Trust that were substantially higher than the market rate for other similar plans.

47.     The bulk of the Plan's recordkeeping expenses charged by Associated Trust are paid directly by participants. Specifically, recordkeeping expenses are allocated to Plan

Case 1:21-cv-00060-WCG   Filed 01/13/21   Page 16 of 26   Document 1

participants on a pro rata basis, with their share of those expenses based on the value of their account balance over the total assets in the Plan.[6] Some of the funds in the Plan also pay a portion of the fees paid for the investments in the Plan to the Plan via a process known as "revenue sharing." While revenue sharing can be a legitimate means of paying for recordkeeping expenses, it is important for retirement plan fiduciaries to closely monitor the amount of revenue sharing payments that are made to ensure that the plan's recordkeeper is not receiving excessive compensation. However, Defendant failed to do so consistent with their fiduciary obligations.

48. As of yearend 2016, the Plan had 5,858 participants. The Plan's Form 5500 reflects that the Plan paid $803,198 to Associated Trust for recordkeeping expenses that year, and that Associated Trust Company received approximately $37,000 in additional revenue sharing, meaning that recordkeeping expenses amounted to at least $143 per participant per year. Based on Plaintiffs' investigation, a prudent and loyal fiduciary of a similarly sized plan could have obtained comparable recordkeeping services for approximately $50 per participant at that time. It was not prudent or in the best interest of participants to allow the Plan to be charged more than three times this amount. A prudent fiduciary would have negotiated an appropriate fee for recordkeeping consistent with the applicable market rate, with any excess revenue sharing payments refunded to participants or used to defray other expenses that would have been borne by participants.

49. These overpayments were not an anomaly. Defendant caused the Plan to pay

---

[6] Due to the pro rata allocation of recordkeeping expenses among Plan participants, some Plan participants paid less than the $50 per participant rate that Plaintiffs allege a prudent fiduciary could have obtained. As is true of all Plan participants, the recordkeeping fees paid by such participants would have been lower if Defendants had negotiated lower overall recordkeeping costs, as Plaintiffs allege Defendants should have done. That is, the level of overall recordkeeping expenses is unrelated to the method by which recordkeeping expenses are allocated among participants. Thus, all Plan participants were harmed by the excessive recordkeeping fees paid to Associated Bank's subsidiary.

17

similarly excessive recordkeeping expenses throughout the statutory period, resulting in millions of dollars in excessive fees during the statutory period. For example, in 2019, the Plan paid $882,482 to Associated Trust Company, N.A. for recordkeeping expenses, and Associated Trust Company received an additional amount of approximately $55,000 in revenue sharing. Given that the Plan had 6,944 participants, this resulted in a per participant recordkeeping rate of $135 per person.

50.     Plaintiffs' estimate of a reasonable recordkeeping is well supported. A recent study by NEPC, an independent investment consulting firm, found that the median rate for recordkeeping services for plans with between 5,000 and 10,000 participants (as the Plan had throughout the applicable statutory period) is approximately $50 per participant, and even the 75th percentile (the highest quartile in cost) is only about $60 per participant.

51.     A prudent fiduciary would not have allowed the Plan to pay excessive amounts for recordkeeping services to Associated Bank's subsidiary year after year. As part of a prudent and loyal fiduciary process, fiduciaries typically monitor the amount of recordkeeping expenses that are being paid and will conduct periodic cost benchmarking to determine whether those amounts are consistent with the amounts paid by other similarly sized plans. Further, prudent fiduciaries frequently submit requests for proposals (RFPs) to potential service providers every few years to obtain competitive information and survey possible alternatives. Based on the excessive amounts paid by the Plan for recordkeeping services, it is reasonable to infer that Defendant failed to take these measures (or took half-measures at best).

## III.   PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

52.     Plaintiffs did not have knowledge of all material facts (including, among other

things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, the availability of superior investment options, or the costs of the Plan's administrative and recordkeeping services compared to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's recordkeeper), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## PLAN-WIDE RELIEF

53.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

54.     Plaintiffs seek recovery for injuries to the Plan sustained as a result of the aforementioned breaches of fiduciary duties during the statutory period commencing in 2015. *See* 29 U.S. Code § 1113(1) (setting 6-year statute of limitations for ERISA breach of fiduciary duties claims in the absence of actual knowledge).

55.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend

to pursue this action vigorously on behalf of the Plan.

56.     Plaintiffs will take procedural steps to ensure the protection and adequate representation of Plan participants, such as by seeking class certification pursuant to Federal Rule of Civil Procedure 23, or by proceeding in accordance with the framework of Federal Rule of Civil Procedure 23.1, including seeking Court approval of any settlement and providing notice of any such settlement to Plan participants.

## **CLASS ACTION ALLEGATIONS**

57.     Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

58.     Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[7]

> All participants and beneficiaries of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan at any time on or after January 13, 2015, excluding any persons with responsibility for the Plan's investment or administrative functions.

59.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 5,600 to 7,000 participants at all relevant times during the applicable period.

60.     Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are or were Plan participants and suffered financial harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Plan participants similarly.

61.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

62.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.  Whether Defendants are fiduciaries with respect to the Plan;

      b.  Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

      c.  The proper form of equitable and injunctive relief;

      d.  The proper measure of monetary relief.

63.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

64.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The

21

accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

65.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

66.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

67.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments.

68.    Defendants breached these fiduciary duties by engaging in the conduct described

herein. Among other things, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's investment options, by improperly prioritizing Associated Bank's proprietary investments over superior available options, and by failing to critically or objectively evaluate the quality of the Plan's proprietary investments in comparison to other investment options. In addition, Defendants caused the Plan to pay excessive recordkeeping fees to Associated Bank's subsidiary, Associated Trust, and failed to properly monitor and control those expenses.

69.     Instead of acting in the best interest of Plan participants, Defendants' conduct and decisions were driven by a desire to drive revenues and profits to Associated Bank and its subsidiaries, and to generally promote Associated Bank's business interests. Accordingly, Defendants failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

70.     Further, each of the actions and omissions described in paragraph 68 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

71.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses.

72.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan

all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from such fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## COUNT II
### Failure to Monitor Fiduciaries

73. As alleged throughout the Complaint, Associated Bank is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

74. Given that Associated Bank has overall oversight responsibility for the Plan, and the specific responsibility to appoint and remove members of the Committee, Associated Bank has a fiduciary responsibility to monitor the performance of the Committee and its members and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

75. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

76. Associated Bank breached its fiduciary monitoring duties by, among other things:

    a. Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions with respect to the Plan;

24

b. Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c. Failing to remove members of the Committee whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and continued to cause the Plan to pay excessive recordkeeping expenses, all to the detriment of the Plan and Plan participants' retirement savings.

77. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees and investment underperformance.

78. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Associated Bank is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Committee, and subsequent failure to take prompt and effective action to rectify the fiduciary breaches set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs as representatives of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful

25

conduct;

E.      An accounting for profits earned by Associated Bank and a subsequent order requiring it to disgorge all profits received from, or in respect of, the Plan;

F.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Associated Bank as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Associated Bank to prevent unjust enrichment from unlawful conduct involving the Plan;

G.      An order enjoining Defendants from any further violations of ERISA;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.      An award of pre-judgment interest;

J.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.      An award of such other and further relief as the Court deems equitable and just.


Dated: January 13, 2021          **NICHOLS KASTER, PLLP**


By: s/ Paul J. Lukas
Paul J. Lukas, MN Bar No. 022084X
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Jacob T. Schutz, MN Bar No. 0395648*
      * *applications for admission forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
jschutz@nka.com

26