# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

Laura Evans and Carol Nowak-Galkowski, as representatives of a class of similarly situated persons, and on behalf of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan,

                Plaintiffs,

v.

Associated Banc-Corp, the Associated Banc-Corp Plan Administrative Committee, Associated Trust Company, N.A., Kellogg Asset Management, LLC, and John and Jane Does 1-20,

                Defendants.

Case No. 1:21-cv-00060-WCG

**AMENDED COMPLAINT**

**CLASS ACTION**

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Laura Evans and Carol Nowak-Galkowski, as representatives of the Class described herein, and on behalf of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Associated Banc-Corp ("Associated Bank"), the Associated Banc-Corp Plan Administrative Committee ("Committee"), Associated Trust Company, N.A., Kellogg Asset Management, LLC, and John and Jane Does 1-20 (collectively, "Defendants"). As described herein, Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by applying an imprudent and inappropriate preference for products associated with Associated Bank within the Plan, despite their poor performance, excessive fees, and lack of traction among fiduciaries of similarly sized plans. Plaintiffs bring this action to remedy

this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     As of December 2020, Americans had approximately $9.6 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $34.9 Trillion in Fourth Quarter 2020* (Mar. 18, 2021), *available at* https://www.ici.org/research/stats/retirement/ret_20_q4. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep

2

costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

4.     For financial services companies like Associated Bank, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, using proprietary investment products that a non-conflicted and objective fiduciary would not choose.

5.     To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011) (citation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.     Associated Bank and the Committee (together, the "Plan Fiduciary Defendants") have not acted in the best interest of the Plan and its participants. Instead, the Plan Fiduciary Defendants used the Plan to promote Associated Bank's proprietary financial products and earn profits for Associated Bank. The retention of Associated Bank's proprietary funds in the Plan reflects a failure to objectively evaluate the Plan's investment options in an unbiased manner. Throughout the statutory period, the Plan Fiduciary Defendants have offered Associated Bank investment products within the Plan that were overwhelmingly rejected by similarly situated fiduciaries. A prudent and loyal fiduciary would not have selected or retained Associated Bank's unpopular, excessively expensive, and poorly performing funds, and would instead have selected superior alternatives covering the same asset classes that are widely used by similarly situated

3

fiduciaries. The imprudent and disloyal retention of Associated Bank financial products in the Plan has resulted in of millions of dollars in lost investment returns to the Plan and its participants since the start of the statutory period in 2015.

7. Moreover, as the fiduciary managers of the Associated Bank investments in the Plan (which were organized as collective investment trusts), Defendants Associated Trust Company, N.A. and Kellogg Asset Management, LLC also breached their fiduciary duties in connection with the selection, monitoring, and retention of underlying funds for those investments, and gave an improper preference to underperforming and excessively costly proprietary products as underlying investments.

8. Based on this conduct, Plaintiffs assert a claim against Defendants for breaches of the fiduciary duties of loyalty and prudence, and against Associated Bank for failing to adequately monitor the Committee and remedy the fiduciary breaches described herein. In connection with this claim, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Associated Bank, Associated Trust Company, N.A. and Kellogg Asset Management, LLC in connection with their fiduciary breaches or the Plan's assets, and other appropriate relief.

## JURISDICTION AND VENUE

9. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

4

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendant may be found.

## THE PARTIES

### PLAINTIFFS

12.     Plaintiff Laura Evans resides in Metamora, Illinois, and has been a participant in the Plan since March 2014. As a Plan participant, the investment options Plaintiff Evans can choose among have been negatively affected by the Plan Fiduciary Defendants' imprudent and disloyal retention of investment options managed by Associated Bank's subsidiaries. Plaintiff Evans would have superior investment options available to her had Defendants not violated ERISA as described herein.

13.     Plaintiff Carol Nowak-Galkowski resides in Sobieski, Wisconsin, and was a participant in the Plan from before the statutory period until approximately January 2018. As a Plan participant, Plaintiff Nowak-Galkowski invested in multiple investment options managed by Associated Bank's subsidiaries.  As a result, she has been financially injured by the unlawful conduct described herein. Plaintiff Nowak-Galkowski's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

### THE PLAN

14.     The Plan was established by Associated Bank. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

15.     The Plan covers eligible employees of Associated Bank and its subsidiaries.

5

Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan.

16.     The Plan is a very large plan in the defined contribution plan marketplace. Since 2014, the Plan has had between $453 million and $690 million in assets and between 5,600 and 7,000 participants, and has consistently ranked in the top half of the 99th percentile of all defined contribution plans by size.[1]

17.     As of the end of 2014, the investment options under the Plan consisted of 7 actively-managed funds organized as collective trusts and managed by Associated Bank's subsidiary, an Associated Bank money market fund, Associated Bank stock, 10 actively managed funds managed by third-parties, and 2 passively managed funds offered by Vanguard. The Plan has held investments affiliated with Associated Bank throughout the statutory period.

**DEFENDANTS**

### Associated Bank

18.     Defendant Associated Banc-Corp ("Associated Bank") is a U.S. regional bank holding company headquartered in Green Bay, Wisconsin. Among its subsidiaries are Associated Bank, N.A., a nationally chartered bank whose subsidiary, Associated Trust Company, N.A., performs asset management for the Plan. Defendant Associated Bank is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Associated Bank exercises discretionary authority or discretionary control with respect to

---

[1] At the end of 2016, there were approximately 656,000 defined contribution plans. Only 2,621 had more than 5,000 participants, and only 1,462 had more than $500 million in assets. U.S. DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Dec. 2018), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2016.pdf.

6

management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

19.     Associated Bank is specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the Department of Labor. Associated Bank's status as Plan Administrator also renders it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

20.     To the extent that Associated Bank has delegated any of its fiduciary functions to others, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

*Associated Trust Company, N.A.*

21.     As discussed above, Associated Trust Company, N.A. is a subsidiary of Associated Bank, N.A. (itself a subsidiary of Associated Bank) and provides fiduciary, administrative and planning services for the Associated Bank investments in the Plan. As discussed below, these investments are structured as collective investment trusts ("CITs"). As the CIT operator and adviser, Associated Trust Company, N.A. was a fiduciary to the Plan obligated to satisfy ERISA's fiduciary standards of loyalty and prudence in monitoring and retaining underlying investments in the CITs.

7

*Kellogg Asset Management, LLC*

22.    Investment management services for the Associated Bank investments in the Plan are provided to Associated Trust Company, N.A. by its wholly owned subsidiary, Kellogg Asset Management, LLC, an SEC-registered investment adviser. As the investment manager of CITs held by the Plan, Kellogg Asset Management, LLC was a fiduciary to the Plan obligated to satisfy ERISA's fiduciary standards of loyalty and prudence in monitoring and retaining underlying investments in the CITs.

*The Plan Administrative Committee*

23.    According to the Plan's Summary Plan Description dated January 1, 2020, "the Compensation and Benefits Committee of the Company's Board of Directors has appointed the Plan Administrative Committee to act as Administrator of this Plan." The duties of the Plan Administrative Committee ("Committee") include selecting the investments offered by the Plan. Pursuant to these authorized duties and functions, the Committee and its members exercise discretionary control respecting management of the Plan, exercise authority or control respecting management or disposition of Plan assets, and/or have discretionary authority or responsibility in the administration of the Plan. The Committee and its members are therefore functional fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

24.    Defendants John and Jane Does 1-20 (the "Doe Defendants") are members of the Committee, or were members of the Committee during the statutory period. The identities of the Doe Defendants are not currently known to Plaintiffs.

## ERISA FIDUCIARY DUTIES

25.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

8

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)    for the exclusive purpose of

            (i)    providing benefits to participants and their beneficiaries; and

            (ii)    defraying reasonable expenses of administering the plan;

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

26.    These ERISA fiduciary duties are "the highest known to the law." *Kraft Foods Glob.*, 814 F. Supp. 2d at 852 (citation omitted).

**DUTY OF LOYALTY**

27.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

9

**DUTY OF PRUDENCE**

28.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

29.     Moreover, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). Indeed, this is a point of emphasis under applicable trust law:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007).

10

## DUTIES AS APPLIED TO COLLECTIVE INVESTMENT TRUSTS

30.     Collective investments trusts ("CITs") are a type of pooled investment like mutual funds.  However, as a condition of exemption from federal securities laws that regulate mutual funds, CITs are only available to employee benefit plans. See 45 Fed. Reg. 8960, 8971-75 (Feb. 11, 1980). Moreover, the operator of a CIT must be a bank or trust company that exercises fiduciary powers under supervision of federal or state banking regulators. *See id*. at 8973.

31.     ERISA treats assets held in CITs as "plan assets". *See* 29 C.F.R. § 2510.3-101(h)(1)(ii). This creates an additional layer of fiduciary responsibility compared to mutual funds. Not only are the plan fiduciaries who set the investment menu obligated to act prudently and loyally in retaining a CIT option, *see Reetz v. Lowe's Companies, Inc.*, 2019 WL 4233616, at *6 (W.D.N.C. Sept. 6, 2019) (finding a "plausible inference that the process for selecting or monitoring the [CIT] Fund was deficient."), the CIT operator and adviser also are obligated to satisfy fiduciary standards in retaining the underlying investments of the CIT. *See Nelsen v. Principal Glob. Inv'rs Tr. Co.*, 362 F. Supp. 3d 627, 641 (S.D. Iowa 2019) (CIT operator and adviser "not excuse[d] … from their obligation to act prudently in monitoring the underlying investments of the … CITs."), *reconsideration denied*, 2019 WL 7496779 (S.D. Iowa Sept. 23, 2019).

32.     The Associated Bank investments in the Plan were held within a CIT structure rather than a mutual fund structure. This creates a separate and independent set of fiduciary duties with respect to these investments.

11

## DEFENDANTS' VIOLATIONS OF ERISA

### I.   THE PLAN FIDUCIARY DEFENDANTS' PROCESS FOR SELECTING AND MONITORING INVESTMENT OPTIONS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST.

33.    The Plan Fiduciary Defendants' process for selecting and monitoring the Plan's investment options was disloyal and imprudent. The Plan Fiduciary Defendants included in the Plan proprietary investments overwhelmingly rejected by fiduciaries of similarly sized plans, when a nonconflicted fiduciary would have selected among the more popular and better performing nonproprietary alternatives available. Although using proprietary options is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments. Based on the Plan Fiduciary Defendants' retention of unpopular, excessively expensive, and poorly performing proprietary funds in asset classes for which superior nonproprietary alternatives were available and far more widely utilized by non-conflicted fiduciaries, and the totality of the circumstances described below, it is reasonable to infer that the Plan Fiduciary Defendants' process for reviewing and monitoring investments for the Plan was tainted by self-interest.  The following examples are illustrative of a fiduciary process for selecting and monitoring investments in the Plan tainted by imprudence and disloyalty, which improperly affected the Plan Fiduciary Defendants' decisions with respect to all of the Associated Bank funds in the Plan.

### Associated Balanced and Growth Balanced LifeStage Funds

34.    The Plan's Associated Balanced LifeStage and Associated Growth Balanced LifeStage Funds offer good examples of the Plan Fiduciary Defendants' imprudent and self-interested process for managing the Plan's investments. Since at least the beginning of 2014, the

12

Plan has included both the Associated Balanced LifeStage and Growth Balanced LifeStage Funds. As of year-end 2016, the Plan had approximately $41 million invested in the Associated Balanced LifeStage Fund and $27.5 million invested in the Associated Growth Balanced LifeStage Fund. As of 2019, the Plan had $43 million invested in the Associated Balanced LifeStage Fund and $27 million in the Associated Growth Balanced LifeStage Fund.

35. Based on a review of publicly filed Form 5500s for plans with over $500 million in assets, Plaintiffs are not aware of any defined contribution plan other than the Plan that offered the Associated Balanced LifeStage Fund or the Associated Growth Balanced LifeStage Fund.[2]

36. The fiduciaries of other large defined contributions preferred other funds over the Associated Balanced LifeStage and Associated Growth Balanced LifeStage Funds for good reason.

37. The following chart shows the performance of the Associated Balanced LifeStage Fund as of the end of 2015 compared to its own custom benchmark identified by Associated Bank, and two other funds which had similar asset allocations and levels of risk,[3] lower fees, and greater acceptance among fiduciaries of similar plans:

---

[2] Even among plans with only $250 million or more in assets, Plaintiffs are aware of only one other defined contribution plan that offered the Associated Balanced LifeStage Fund, and none that offered the Associated Growth Balanced LifeStage Fund.

[3] Morningstar has created a taxonomy of mutual funds that divides mutual funds into 64 different categories, with categorization determined by historical analysis of the underlying holdings of each fund. All three funds in the chart were placed by Morningstar in the US Fund Allocation—50% to 70% Equity category.

13

| Fund Name | Ticker | 3-Yr Return (as of 12/31/15) | 5-Year Return (as of 12/31/15)[4] | Current Expense Ratio (as of 8/31/2019) | # of Plans > $500M in Fund |
|---|---|---|---|---|---|
| Associated Balanced LifeStage[5] | | 6.83% | 6.04% | 0.76% | 1 (the Plan) |
| Associated Balanced LifeStage Custom Benchmark | N/A | 7.41% | 7.07% | N/A | N/A |
| Vanguard Wellington Admiral | VWENX | 9.64% | 9.07% | 0.17% | 210 |
| American Funds American Balanced R6 | RLBGX | 10.81% | 10.18% | 0.27% | 75 |

38.     A prudent and loyal review of the marketplace in 2015 would have revealed that the Associated Balanced LifeStage Fund was underperforming its benchmark, and that the Vanguard and American Funds options were performing significantly better at lower cost than the Associated Balanced LifeStage Fund.  As a result, a prudent and loyal fiduciary would have removed the Associated Bank fund. The Plan Fiduciary Defendants' retention of the Associated Balanced LifeStage Fund in the Plan reflects a fiduciary process imprudently and disloyally tilted in Associated Bank's favor.

39.     Similarly, the following chart shows the performance of the Associated Growth Balanced LifeStage Fund as of the end of 2015 compared to its custom benchmark and two other

---

[4] The Associated Balanced LifeStage fund also trailed its custom benchmark over the prior 10-years ending December 31, 2015, and underperformed Plaintiffs' comparators during this same time period. These trends were consistent throughout the statutory period. As of December 31, 2020, the Associated Balanced LifeStage fund had also underperformed its benchmark over the prior 10-year period, while the comparators cited by Plaintiffs performed significantly better over this same timeframe.

[5] Reported returns for the Associated Balanced LifeStage Fund appear to be exaggerated by Associated Bank and its affiliates by approximately 0.40% to 0.45% per year. Plaintiffs' investigation has revealed that Defendants' performance disclosures to participants did not include the "Investment Charge" assessed to all participants invested in the Associated Balanced LifeStage Fund that was 0.45% per year in 2019, and 0.40% per year in 2020. Because Plaintiffs do not know the fee amounts for years prior to 2019, they are not able to re-calculate the performance inclusive of those fees.  As a result, the performance for the Associated Balanced LifeStage Fund shown in the table is higher than its actual performance net of all fees.

funds which had similar asset allocations and levels of risk,[6] lower fees, and greater acceptance among fiduciaries of similar plans:

| Fund Name | Ticker | 3-Yr Return (as of 12/31/15) | 5-Year Return (as of 12/31/15)[7] | Expense Ratio (as of 8/31/2019) | # of Plans > $500M in Fund |
|---|---|---|---|---|---|
| Associated Growth Balanced LifeStage[8] | | 8.3% | 7.02% | 0.82% | 1 (the Plan) |
| Associated Growth Balanced LifeStage Custom Benchmark | N/A | 9.26% | 8.33% | N/A | N/A |
| T. Rowe Price Capital Appreciation | PRWCX | 13.15% | 11.39% | 0.59%[9] | 18 |
| Fidelity Puritan | FPURX | 10.69% | 9.21% | 0.53% | 84 |

40. Again, a prudent and loyal review of the marketplace in 2015 would have revealed that the Associated Growth Balanced LifeStage Fund was underperforming its benchmark, and that the T. Rowe Price and Fidelity options were performing significantly better at lower cost than

---

[6] All three funds in the chart were placed by Morningstar in the US Fund Allocation—50% to 70% Equity category.

[7] Like the Associated Balanced LifeStage Fund, the Associated Growth Balanced LifeStage fund also trailed its custom benchmark over the 10-year period ending December 31, 2015, and underperformed Plaintiffs' comparators during this same time period. These trends were consistent throughout the statutory period. As of December 31, 2020, the Associated Growth Balanced LifeStage fund had also underperformed its benchmark over the prior 10-year period, while the comparators cited by Plaintiffs performed significantly better over this same timeframe.

[8] Reported returns shown for the Associated Growth Balanced LifeStage Fund appear to be exaggerated by Associated Bank and its affiliates by approximately 0.40% to 0.45% per year. Plaintiffs' investigation has revealed that Defendants' performance disclosures to participants did not include the annual "Investment Charge" assessed to all participants invested in the Associated Growth Balanced LifeStage Fund that was 0.45% per year in 2019, and 0.40% per year in 2020. Because Plaintiffs do not know the fee amounts for years prior to 2019, they are not able to re-calculate the performance inclusive of those fees. As a result, the performance for the Associated Growth Balanced LifeStage Fund shown in the table is higher than its actual performance net of all fees.

[9] A less expensive share class of the T. Rowe Price Capital Appreciation fund, for which the Plan would have qualified, was launched in 2016. As of 2019, this share class (TRAIX) charged only 0.59%. Performance shown for year-end 2015 is that of PRWCX as of December 31, 2015. PRWCX had an expense ratio of 0.7% as of August 31, 2019.

the Associated Growth Balanced LifeStage Fund. As a result, a prudent and loyal fiduciary would have removed the Associated Bank fund. The Plan Fiduciary Defendants' retention of the Associated Growth Balanced LifeStage Fund in the Plan also reflects a fiduciary process imprudently and disloyally tilted in Associated Bank's favor.

41. A comparison to the fees charged by other products in the marketplace further explains why Associated Bank's funds have zero market penetration among plans with more than $500 million in assets. In 2016 (the most recent year with comprehensive analysis), the average expense ratio for non-target date balanced funds for plans with between $250 million and $1 billion in assets was between 0.37% and 0.39%. *See The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* (June 2019), at 51, *available at* https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf. Even though investment expenses have generally been falling over time, as of 2019, the Associated Bank balanced funds in the Plan were twice as expensive as this range.

42. Instead of removing these poorly performing, excessively expensive Associated Bank investments, in 2017 the Plan Fiduciary Defendants removed a *non*-proprietary fund in the same asset class (the Vanguard Balanced Index Fund), while imprudently and disloyally retaining the Associated Bank funds. This led to a predictably poor outcome for Plan participants. As of year-end 2015, the Associated Balanced LifeStage Fund had materially trailed the removed Vanguard fund by 2.46% and 2.67% over the prior 3- and 5-year periods respectively. The performance of the Associated Growth Balanced LifeStage Fund at this time was similarly poor compared to this Vanguard option, trailing it by 0.99% and 1.69% over the prior 3- and 5-year periods respectively. Unlike the Associated Bank funds, the Vanguard Balanced Index Fund was widely held by similarly situated fiduciaries, appearing in over 60 plans with over $500 million in

16

assets.

43.     As the Plan Fiduciary Defendants should have realized based on these 2015 performance numbers, the Plan would have been far better served by retaining the Vanguard fund and removing the two Associated Bank funds. As of September 30, 2020, the Associated Balanced LifeStage Fund had materially trailed the Vanguard fund by 1.87% and 1.83% over the prior 3- and 5-year periods respectively. Likewise, as of the same date, the Associated Growth Balanced LifeStage Fund had materially trailed the Vanguard fund by 0.8% and 0.29% over the prior 3- and 5-year periods respectively, despite the fact that the Associated fund was taking on *more* risk than the Vanguard fund. On a risk-adjusted basis, the Vanguard fund outperformed the Associated Growth Balanced Fund by 1.35% and 1.13% per year over the prior 3- and 5-year periods.[10] However, instead of removing the Associated Bank options, the Plan Fiduciary Defendants removed the nonproprietary Vanguard option in 2017, further reflecting a disloyal and imprudent fiduciary process that tainted the Plan's entire menu of Associated Bank investment options.

*Associated Equity Income Fund*

44.     Another good example of Defendant's flawed investment management process is the Associated Equity Income Fund in the Plan, which was included in the Plan from at least the beginning of 2014 until some point in 2017.

---

[10] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. Not only did the Associated Balanced LifeStage and Growth Balanced LifeStage Funds show almost entirely negative alpha during the subject period, but this lack of skill—both on an absolute basis and compared to Vanguard Balanced—should have been apparent to the Plan's fiduciaries at the beginning of the subject period. As of December 31, 2015, the Balanced Fund had an alpha of -1.12% and -1.71% *per year* against its custom benchmark over the prior 3- and 5-year periods respectively, compared with positive alpha of 0.37% and 0.50% by Vanguard Balanced against the same benchmark. The Growth Balanced Fund had alpha of -1.26% and -1.92% against its custom benchmark over those same 3- and 5-year periods.

45.     Plaintiffs are not aware of any defined contribution with over $250 million in assets that offered the Associated Equity Income Fund during the relevant time period.

46.     The fiduciaries of other large defined contributions avoided the Associated Equity Income Fund for good reason. As of year-end 2015, the Associated Equity Income Fund had underperformed its benchmark by 1.06% and 1.52% over the prior 3- and 5- year periods, respectively.[11] A prudent and loyal fiduciary would have removed this fund at the beginning of the statutory period based on this performance.

47.     The foregoing examples reflect a fiduciary process tainted by self-interest, resulting in imprudent and disloyal decisions that infected the selection and monitoring of all Associated Bank-affiliated investments in the Plan. Indeed, although asset management companies such as Associated Bank tend to favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016). Further, this poor performance tends to persist, empirically demonstrating that "the decision to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808–10. A study of third-party administrators such as Associated Bank similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns

---

[11] These figures are based on reported returns for the Associated Equity Income Fund. However, reported returns for the Associated Equity Income Fund appear to have been exaggerated by Associated Bank and its affiliates by approximately 0.30% per year. Plaintiffs' investigation has revealed that Defendants' performance disclosures to participants did not include the annual "Investment Charge" assessed to all participants invested in the Associated Equity Income Fund, which was 0.30% per year as of 2020. Because Plaintiffs do not know the fee amounts for years prior to 2019, they are not able to re-calculate the performance inclusive of those fees. As a result, the underperformance is even greater than reported.

are attributable to the use of proprietary funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

48. Given the poor track record of Associated Bank's funds and their lack of utilization among fiduciaries of other large plans, it was imprudent to retain these funds in the Plan. The Plan Fiduciary Defendants improperly retained these funds to serve Associated Bank's own business interests, not participants' interests, and generate additional investment fee income for Associated Bank.

49. The unpopularity of Associated Bank's investments among similarly sized plans at least partially explains why the Plan Fiduciary Defendants retained such investments in the Plan even though participants would have been better served by better performing, less expensive, and more widely accepted alternative investments: The Plan's monies in Associated Bank's investments represent massive portions of those investments' total assets under management. For example, as of December 31, 2019, the Plan has $49.3 million invested in the Associated Growth LifeStage Fund. As of year end 2020, the Associated Growth LifeStage Fund had a total of only $216.3 million in assets under management. The Plan's share was therefore over 22% of the investment's total assets. Similarly, the Plan's investment of over $43 million in the Associated Balanced LifeStage Fund (as of year-end 2019) amounted to at least 21% of the fund's $197.8 million in assets (as of year-end 2020).

50. Defendants not only disloyally and imprudently retained underperforming and costly proprietary funds in the Plan's lineup, they also inaccurately reported the performance of those funds. Associated Bank or its affiliates impose an annual "Investment Charge" to each proprietary fund in the Plan other than the Money Market Fund. As of 2020, this fee was 0.30% per year for each single asset class investment (Associated Core Bond and Associated Short Term

19

Bond), and 0.40% for each asset allocation fund (Associated Balanced LifeStage, Conservative Balanced LifeStage, Growth Balanced LifeStage, and Growth LifeStage), down from 0.45% per year as of 2019. The "Investment Charge" was not assessed to any nonproprietary funds. In reporting the performance of these funds to participants in the 404a-5 annual disclosures provided to participants pursuant to 29 C.F.R. § 2550.404a-5(d)(1)(ii), Associated Bank or its affiliates did not include the impact of this fee in reported performance, thus violating applicable regulations[12] and exaggerating the performance of single asset class funds by approximately 0.30% per year and of asset allocation funds by approximately 0.40% to 0.45% per year. This had the effect of making Associated Bank's proprietary investments appear more attractive relative to the Plan's nonproprietary offerings than they actually were, given that nonproprietary fund performance was reported net of all expenses.

## II. ASSOCIATED BANK FAILED TO MANAGE THE PLAN'S CITS IN A LOYAL AND COST-CONSCIOUS MANNER

51. Associated Bank's subsidiaries, Associated Trust Company, N.A. ("ATC") and Kellogg Asset Management, LLC ("Kellogg"), also failed in their separate fiduciary duty to prudently and loyally monitor the underlying investments of Associated Bank funds in the Plan, which were organized as CITs. Indeed, the fee excesses and underperformance of these Associated Bank funds are attributable, in part, to these failures. If ATC and Kellogg had managed the Plan's CITs consistent with their fiduciary duties, participants would have experienced higher net investment returns.

---

[12] *See* 29 C.F.R. § 2550.404a-5(h)(3) (requiring that the performance of all designated investment alternatives reported annually to participants be computed in accordance with the required methodology for mutual fund prospectuses outlined in Form N-1A); SEC Form N-1A at 54 (Item 26(b)(1), Inst. 3) (requiring that reported performance "[i]nclude all recurring fees that are charged to all shareholder accounts"), *available at* https://www.sec.gov/about/forms/formn-1a.pdf.

52.     ATC and Kellogg retained poorly performing proprietary CITs as underlying holdings of the Associated Bank CITs in the Plan. For example, although it was removed from the Plan as a standalone option in 2017, the Associated Equity Income fund discussed above remained an underlying investment of the Associated Growth LifeStage, Associated Balanced LifeStage, and Associated Balanced Growth LifeStage funds at least as recently as year-end 2020. Indeed, Associated Bank CITs constituted up to 45% of the underlying holdings of the Associated Bank asset allocation funds in the Plan.

53.     Moreover, a substantial portion of the excessive fees for the Associated Bank investments in the Plan was attributable to an "Associated investment charge" of up to 0.45%. Given the size of the Plan and what comparable managers charge for similar services, Defendants could have instead obtained the same CIT portfolio management service for only approximately 0.10%.

54.     Thus, not only were the Associated Bank funds in the Plan excessively expensive compared to better performing, more widely used alternatives, but in return for those excessive fees, Associated Bank self-interestedly selected and retained its own underperforming funds as the underlying investments. These imprudent and disloyal actions drove additional business and revenue to Associated Bank, but constituted fiduciary breaches that harmed Plan participants.

## III.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

55.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, or the availability of superior investment options necessary to understand that Defendants breached their fiduciary duties and

engaged in unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including the Plan Fiduciary Defendants' processes for selecting, monitoring, evaluating and removing Plan investments, and ATC and Kellogg's process for selecting, monitoring, evaluating, and retaining underlying investments of the Associated Bank CITs in the Plan), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the totality of the facts and circumstances set forth above.

## PLAN-WIDE RELIEF

56.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

57.     Plaintiffs seek recovery for injuries to the Plan sustained as a result of the aforementioned breaches of fiduciary duties during the statutory period commencing in 2015. *See* 29 U.S. Code § 1113(1) (setting 6-year statute of limitations for ERISA breach of fiduciary duties claims in the absence of actual knowledge).

58.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend to pursue this action vigorously on behalf of the Plan.

59.     Plaintiffs will take procedural steps to ensure the protection and adequate

representation of Plan participants, such as by seeking class certification pursuant to Federal Rule of Civil Procedure 23, or by proceeding in accordance with the framework of Federal Rule of Civil Procedure 23.1, including seeking Court approval of any settlement and providing notice of any such settlement to Plan participants.

## **CLASS ACTION ALLEGATIONS**

60. Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

61. Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[13]

> All participants and beneficiaries of the Associated Banc-Corp 401(k) and Employee Stock Ownership Plan at any time on or after January 13, 2015, excluding any persons with responsibility for the Plan's investment or administrative functions.

62. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 5,600 to 7,000 participants at all relevant times during the applicable period.

63. <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are or were Plan participants and were injured by Defendants' mismanagement of the Plan and its investments. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

64. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class.

---

[13] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

65.     Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.   Whether Defendants are fiduciaries with respect to the Plan;

   b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

   c.   The proper form of equitable and injunctive relief;

   d.   The proper measure of monetary relief.

66.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

67.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

68.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29  U.S.C. § 1104(a)(1)(A)–(B)

69.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

70.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments.

71.     Defendants breached these fiduciary duties by engaging in the conduct described herein.  Among other things, the Plan Fiduciary Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's investment options, by improperly

prioritizing Associated Bank's proprietary investments over superior available options, and by failing to critically or objectively evaluate the quality of the Plan's proprietary investments in comparison to other investment options. In addition, ATC and Kellogg failed to employ a prudent and loyal process for selecting, monitoring, reviewing, and retaining the underlying investments of the Associated Bank CITs in the Plan.

72.     Instead of acting in the best interest of Plan participants, Defendants' conduct and decisions were driven by a desire to drive revenues and profits to Associated Bank and its subsidiaries, and to generally promote Associated Bank's business interests. Accordingly, Defendants failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

73.     Further, each of the actions and omissions described in paragraph 71 above and elsewhere in this Amended Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

74.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses.

75.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting

from such fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

**COUNT II**
**Failure to Monitor Fiduciaries**

76. As alleged throughout the Amended Complaint, Associated Bank is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

77. Given that Associated Bank has overall oversight responsibility for the Plan, and the specific responsibility to appoint and remove members of the Committee, Associated Bank has a fiduciary responsibility to monitor the performance of the Committee and its members and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

78. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

79. Associated Bank breached its fiduciary monitoring duties by, among other things:

   a. Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions with respect to the Plan;

   b. Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

27

c. Failing to remove members of the Committee whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

80. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees and investment underperformance.

81. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Associated Bank is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Committee, and subsequent failure to take prompt and effective action to rectify the fiduciary breaches set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E. An accounting for profits earned by Associated Bank, ATC, and Kellogg, and a subsequent order requiring them to disgorge all profits received from, or in respect of, the Plan;

F. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive

28

trust on all assets of the Plan transferred to Associated Bank, ATC, or Kellogg as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Associated Bank, ATC, and/or Kellogg to prevent unjust enrichment from unlawful conduct involving the Plan;

G.      An order enjoining Defendants from any further violations of ERISA;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.      An award of pre-judgment interest;

J.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.      An award of such other and further relief as the Court deems equitable and just.

Dated: April 8, 2021                  **NICHOLS KASTER, PLLP**

By: s/ Kai H. Richter
Paul J. Lukas, MN Bar No. 022084X
Kai H. Richter, MN Bar No. 0296545
Brock J. Specht, MN Bar No. 0388343
Jacob T. Schutz, MN Bar No. 0395648
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
jschutz@nka.com